FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP 2 6 2007

By: JAMES N. HATTEN, Clerk

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WEYERHAEUSER COMPANY,

           Appellant,

v.

RANDALL LAMBERT, the Litigation
Claims Representative for the
Chapter 11 Bankruptcy Estate of
Paragon Trade Brands, Inc.,

           Respondent.

CIVIL ACTION NO.
1:05-CV-1144-JEC

### ORDER AND OPINION

This case is presently before the Court on Weyerhaeuser's appeal from the bankruptcy court's order granting summary judgment to Paragon, and entering judgment against Weyerhaeuser after a trial on damages. (Weyerhaeuser's Notice of Appeal [2].)  Paragon has filed a cross-appeal. (Paragon's Notice of Cross-Appeal [3].)  Paragon has also filed a Motion for Leave to File Post-Hearing Brief [50], and a Motion to Supplement the Record [52].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Paragon's Motion for Leave to File Post-Hearing Brief [50] should be **DENIED**, Paragon's Motion to Supplement the

AO 72A
(Rev.8/82)

Record [52] should be **GRANTED**, and the bankruptcy court's order granting summary judgment to Paragon and entering judgment against Weyerhaeuser should be **REVERSED**.

## BACKGROUND

### I.    Procedural History

This case is on appeal from the United States Bankruptcy Court for the Northern District of Georgia.  Debtor Paragon Trade Brands, Inc. ("Paragon") filed a Chapter 11 Bankruptcy in January, 1998. (Bankruptcy Court's Order Granting Pl.'s Mot. for Partial Summ. J. ("SJO") at 2-3, attached to Br. of Appellant Weyerhaeuser Company ("Appellant's Br.") [34] at ER7.)  The bankruptcy court confirmed and implemented Paragon's Chapter 11 plan in January, 2000.  (*Id.* at 1.) Pursuant to the plan, the court appointed respondent Randall Lambert as the litigation trustee of Paragon's Chapter 11 estate. (*Id.*)

Lambert subsequently filed this adversary action against Weyerhaeuser on behalf of Paragon's estate.  (*Id.*)  In the Complaint, Paragon claimed that Weyerhaeuser breached warranties contained in two contracts, an Asset Transfer Agreement ("ATA") and an Intellectual Property Agreement ("IPA"), by which Weyerhaeuser transferred its infant diaper business to Paragon in 1993.  (*Id.*) Paragon sought to recover damages allegedly resulting from the breach.  (SJO at 1.)

2

After discovery, the bankruptcy court granted Paragon's motion, and denied Weyerhaeuser's motion, for summary judgment on liability. (SJO at 53.)  The court then held a trial on damages, and entered a judgment in favor of Paragon in the amount of $457,858,150.00, plus attorneys' fees and expenses.  (Bankruptcy Court's Amended Findings of Fact and Conclusions of Law "BR Findings" at ¶ 265, 266, attached to Appellant's Br. at ER8.)

Weyerhaeuser appeals the bankruptcy court's rulings on summary judgment, as well as the bankruptcy court's damages award.  (Notice of Appeal [2].)  Paragon cross-appeals the bankruptcy court's denial of prejudgment interest on certain damages.  (Notice of Cross-Appeal [3].)   The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158.

## II. **Factual Background**

### A. **Weyerhaeuser's Infant Diaper Business**

Weyerhaeuser began operating its infant diaper business in 1972. (BR Findings at ¶ 5.)   The business consisted largely of selling diapers to retail establishments, who resold the diapers at lower prices than the branded diapers sold by Proctor and Gamble ("P&G") and Kimberly Clark ("KC"). (Id.)

Weyerhaeuser's diaper business performed well in the early 1980s.  (SJO at 13.)  A key to Weyerhaeuser's success was a "brand matching" strategy, whereby Weyerhaeuser incorporated features of

3

brand name diapers into its less expensive diaper. (*Id.*) One feature that Weyerhaeuser incorporated in its diaper in the early 1980s was an outer elastic leg gather designed to reduce leakage. (*Id.*) Shortly after Weyerhaeuser began utilizing the outer leg gather, P&G notified Weyerhaeuser that it owned a patent covering the feature. (*Id.*) P&G ultimately sued Weyerhaeuser for infringing the patent. (*Id.*) In 1985, the trial judge presiding over the litigation entered an order permanently enjoining Weyerhaeuser from utilizing the infringing feature and awarding P&G damages of over $2.3 million. (SJO at 13.)

After the injunction, Weyerhaeuser's diaper business suffered decreased sales and substantially reduced profits. (*Id.* at 14.) For a number of reasons, including the injunction and the increasingly competitive diaper market, by mid-1990 Weyerhaeuser considered its diaper business to be financially "sick." (*Id.*) Weyerhaeuser decided that it needed to improve the quality of its diaper in order to salvage the diaper business. (*Id.*) The primary means for improvement was the addition of a feature known as the "inner leg gather" ("ILG"). (*Id.*) The ILG was a popular feature because it reduced leakage. (SJO at 14.) Both KC and P&G developed and marketed an ILG diaper in 1990. (*Id.*) Weyerhaeuser followed suit in March, 1991, launching its own "Ultra" ILG diaper. (*Id.* at 15.)

The ILG was a huge success for the business. (*Id.*)

4

Weyerhaeuser was aware, however, that P&G and KC both owned patents that potentially encompassed the ILG feature.  (*Id.*)  Before launching its ILG diaper, Weyerhaeuser negotiated with P&G to obtain a license to use the ILG feature, but those negotiations were unsuccessful.  (SJO at 15.)  Weyerhaeuser also conducted license negotiations with KC, which were unsuccessful.  (*Id.* at 29.)

In December, 1991, P&G formally notified Weyerhaeuser that its Ultra diaper infringed P&G's "Lawson" and "Dragoo" patents.  (*Id.* at 19.)  Shortly thereafter, KC notified Weyerhaeuser that the Ultra diaper infringed KC's "Enloe" patent.  (Prospectus at 8, 27-28, attached to Appellant's Br. [34] at ER4.)

Following additional, unsuccessful license negotiations with P&G and KC, Weyerhaeuser focused on developing a defense to the threatened infringement claims.  (SJO 16-17; BR Findings at ¶ 16.) To that end, Weyerhaeuser obtained patent opinions from outside counsel that P&G and KC's patents were invalid.  (BR Findings at ¶ 16.)  Weyerhaeuser also obtained advice concerning a non-infringement defense based on differences between Weyerhaeuser's ILG and the feature described in the Lawson, Dragoo, and Enloe patents. (Prospectus at 28, attached to Appellant's Br. at ER4.)

**B.    Transfer of the Business to Paragon**

In 1991, as part of an overall plan to refocus on its core business, Weyerhaeuser decided to divest the infant diaper business.

5

(BR Findings at ¶¶ 6, 20.)   Weyerhaeuser investigated several alternatives for disposing of the business.   Ultimately, Weyerhaeuser decided to sell the business to the investing public through an initial public offering ("IPO").   (*Id.* at ¶ 25.) Weyerhaeuser planned to form a new subsidiary, transfer the diaper business into the subsidiary, and then sell 100% of the subsidiary's stock in the IPO.   (*Id.*)

Weyerhaeuser began preparing for the IPO in the summer of 1992. In June, 1992, Weyerhaeuser incorporated Paragon as its wholly owned subsidiary to own the diaper business.   (*Id.*) Weyerhaeuser retained Merrill Lynch as the lead underwriter for the offering.   (*Id.*)

The IPO closed on February 2, 1993.   (BR Findings at ¶ 35.)   At closing, Weyerhaeuser transferred the diaper business to Paragon by executing the ATA and IPA.   (BR Findings at ¶ 36.)   Concurrently, Weyerhaeuser sold 11.5 million shares of Paragon common stock to public investors, and received approximately $214 million in proceeds from the sale.   (*Id.*)   After the IPO, Weyerhaeuser employees who had been responsible for the diaper business became the new managers of Paragon.   (*Id.*)

Pursuant to the ATA and IPA, Paragon assumed virtually all liabilities of Weyerhaeuser relating to the operation of the diaper business, past and prospective, including patent liabilities.   (*Id.*) In addition, Paragon agreed to indemnify and defend Weyerhaeuser for

6

any liability arising from the assumed liabilities, including any claims for patent infringement. (*Id.*) Paragon also executed a U.S. Assignment and Assumption Agreement, in which it specifically assumed all liability associated with the P&G and KC patent infringement claims. (U.S. Assignment and Assumption Agreement ("Assumption Agreement"), attached to Appellant's Br. at ER3.)

At the time of the IPO, Weyerhaeuser's primary product was the Ultra diaper with the ILG feature. (SJO at 3.) In the months leading up to the IPO, Weyerhaeuser continued to conduct negotiations with P&G and K-C concerning the ILG. (BR Findings at ¶ 29.) P&G's last demand prior to the closing was for a 3% royalty on net sales of all ILG products in return for a license under the Lawson and Dragoo patents. (*Id.*) KC's last demand before the IPO closed was for a 2.5% royalty on net sales of ILG products for seven and a half years in return for a license under the Enloe patent. (*Id.*) Weyerhaeuser refused to pay royalties at those rates, and was unable to negotiate licenses with either P&G or KC before the closing. (*Id.*) When the IPO closed, all of the parties involved in the transaction, including Weyerhaeuser, Paragon, and Merrill Lynch, knew that P&G and KC owned patents that potentially covered the ILG feature, and that there was a risk that P&G and KC would assert patent infringement claims against Paragon. (Prospectus at 8, 27-28.)

7

## C.   Paragon's Patent Liability and Bankruptcy

After the closing, Paragon continued to produce the Ultra diaper with the ILG feature.  (BR Findings at ¶ 2, 37.)  On January 20, 1994, P&G sued Paragon in the Delaware district court for infringing P&G's Lawson and Dragoo patents.  (*Id.* at ¶ 39.)  P&G offered to dismiss the suit in return for a 2.5% royalty licensing agreement. (*Id.*)  Paragon countered with an offer of a 0.1% royalty agreement. (*Id.*)  Paragon and P&G were unable to agree upon an acceptable royalty, and the trial progressed.  (*Id.* at ¶ 40.)  In 1995, while the P&G litigation was ongoing, KC filed suit against Paragon in the Texas district court for infringing the Enloe patents.  (BR Findings at ¶ 41.)

In late 1997, the Delaware district court entered judgment against Paragon, finding that the Ultra diaper's ILG feature infringed patents belonging to P&G.  (*Id.* at ¶ 45.)  The court enjoined Paragon from selling the Ultra diaper, and held Paragon liable for $178 million in damages for past infringement.  (*Id.*)  The judgment prompted Paragon to file a petition for reorganization under Chapter 11 of the Bankruptcy Code in January, 1998.  (*Id.* at ¶ 3.) As part of its reorganization, Paragon entered into settlement agreements with both P&G and KC, providing Paragon with licenses to utilize the ILG feature.  (*Id.* at ¶ 2.)  Lambert subsequently filed this adversary proceeding, seeking damages related to Paragon's

8

AO 72A
(Rev.8/82)

patent infringement liability.

### III. **The Bankruptcy Court's Summary Judgment Order and Trial Findings**

As noted, the bankruptcy court granted summary judgment to Paragon on liability. In its summary judgment order, the bankruptcy court found that Weyerhaeuser had breached four contractual warranties in the ATA and IPA. (SJO at 53.) Weyerhaeuser filed a motion for reconsideration, which the bankruptcy court denied after briefing and oral argument. (Weyerhaeuser's Mot. for Reconsideration, BR Docket [127].)

After deciding the summary judgment motions, the bankruptcy court held a trial on the issue of damages. (BR Findings at ¶ 4.) At trial, both parties presented evidence on damages, and Weyerhaeuser presented evidence on a counterclaim for contractual indemnity. (*Id.*) The bankruptcy court rejected Weyerhaeuser's counterclaim, and awarded damages to Paragon in the amount of $457,858,150.00. (*Id.* at ¶ 265.) The Court also awarded Paragon $3,017,210.07 for attorneys' fees and expenses through September 30, 2003. (*Id.* at ¶ 266.)

Weyerhaeuser now appeals the bankruptcy court's order granting Paragon's motion for summary judgment, and denying Weyerhaeuser's motion. (Appellant's Br. [34] at 4-5.) Weyerhaeuser contends that the bankruptcy court's interpretation of the warranties in the ATA and IPA conflicts with the parties' unambiguously expressed intent in

AO 72A
(Rev.8/82)

the transfer documents. (*Id.*) According to Weyerhaeuser, Paragon assumed all risk of patent liability arising from its operation of the diaper business, and none of the warranties can be interpreted to shift that liability to Weyerhaeuser. (*Id.*)

Weyerhaeuser also appeals the bankruptcy court's award following its trial on damages. (*Id.*) Specifically, Weyerhaeuser asserts that the bankruptcy court erred in awarding damages for speculative lost profits, and in applying a "cost-to-cure" measure of damages instead of the "difference-in-value" measure required by Washington law. (*Id.* at 6.)

Paragon argues that the bankruptcy court correctly interpreted the ATA and IPA in finding that Weyerhaeuser breached the warranties in those contracts, and in granting Paragon's motion for summary judgment as to liability. (Appellee's Br. [37].) Paragon also contends that its lost profits are not speculative, and that "cost-to-cure" is the proper measure of its damages. (*Id.* at 2.) As to its cross-appeal, Paragon contends that the bankruptcy court should have awarded prejudgment interest on damages that have been "objectively determinable" since plan confirmation. (*Id.*)

## DISCUSSION

### I.   Paragon's Motion to Supplement the Record

As a preliminary matter, Paragon has filed a motion to supplement the record to add a response to a document, produced by

10

Weyerhaeuser at oral argument, indicating that the bankruptcy court's summary judgment order essentially copied, verbatim, Paragon's proposed summary judgment order. (Paragon's Mot. to Supplement Record [52].) The document Paragon seeks to add to the record demonstrates differences between the two orders. (*Id.*) The Court **GRANTS** Paragon's Motion to supplement the record. The Court also notes that in deciding this case, it has not considered any similarities between the bankruptcy court's order and Paragon's proposed order.

## II.   Paragon's Motion for Leave to File Post-Hearing Brief

Paragon also requests leave to file a post-hearing brief. (Paragon's Mot. to File Post-Hearing Br. [50].) The Court agrees with Weyerhaeuser that there is no reason to allow additional briefing in this case. (Weyerhaeuser's Opposition to Pl.'s Mot. to File Post-Hearing Br. [51].) Paragon has filed over 130 pages of briefing, and has had an opportunity to present two hours of oral argument. (Appellee's Br. [37]; Appellee's Reply Br. [39]; Oral Argument Tr. [43].) Accordingly, the Court **DENIES** Paragon's motion for leave to file a post-hearing brief.[1]

---

[1] The Court also notes that it has reviewed the arguments in the post-hearing brief, and does not find any arguments that would alter the Court's review of the bankruptcy court's summary judgment order.

11

AO 72A
(Rev.8/82)

### III. **Weyerhaeuser's Appeal**

#### A.    **Standard of Review on Appeal from the Bankruptcy Court**

When sitting as an appellate court, "the district court . . . may affirm, modify, or reverse a bankruptcy [court's] judgment, order, or decree or remand with instructions for further proceedings." BANK. R. 8013.  The bankruptcy court's summary judgment ruling is subject to *de novo* review.  *In re Optical Techs., Inc.,* 246 F.3d 1332, 1334-35 (11th Cir. 2001) (citing *In re Walker,* 48 F.3d 1161, 1163 (11th Cir. 1995).  As to the bankruptcy court's trial rulings, the Court reviews findings of fact for clear error and legal conclusions *de novo.   In re Das A. Borden & Co.,* 131 F.3d 1459, 1462 (11th Cir. 1997) (citing *In re Miller,* 39 F.3d 301, 304-05 (11th Cir. 1994)).

#### B.    **Washington law governs the parties' dispute**.

The parties do not dispute that Washington law governs the Court's interpretation of the transfer documents.  (Appellant's Br. at 18; Appellee's Br. at 20.)  Section 13.03 of the ATA provides:

> Governing Law.  This Agreement shall be governed by and enforced in accordance with the laws of the State of Washington (regardless of the laws that might otherwise govern under applicable principles of conflicts law) as to all matters, including, without limitation, matters of validity, construction, effect, performance and remedies.

(ATA § 13.03, attached to Appellant's Br. at ER 1.)

In Washington, as in most jurisdictions, the intent of the

12

parties is "the touchstone" of contract interpretation. *Scott Galvanizing, Inc. v. NW EnviroServices, Inc.*, 120 Wash. 2d 573, 580, 844 P.2d 428, 432 (Wash. 1993) (citing *Berg v. Hudesman,* 115 Wash. 2d 657, 663, 801 P.2d 222 (Wash. 1990)). In *Berg*, the Washington Supreme Court adopted the "context rule." *Berg*, 115 Wash. 2d at 669, 801 P.2d at 229-230. Under the context rule:

> the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'

*Go2Net, Inc. v. CI Host, Inc.,* 115 Wash. App. 73, 84, 60 P.3d 1245, 1250 (Wash. App. 2003).

Applying the context rule, the Court may use extrinsic evidence "for the purpose of aiding in the interpretation" of the parties' contract. *Id.* at 84, 1251. However, admissible extrinsic evidence does not include: (1) evidence of a party's unilateral or subjective intent; (2) evidence that would show an intention independent of the contract; or (3) evidence that varies, contradicts or modifies the written language of the contract. *Id.* *See also Hearst Commc'ns, Inc. v. Seattle Times Co.,* 154 Wash. 2d 493, 503, 115 P.3d 262, 267 (Wash. 2005) (explaining that courts should "attempt to determine the parties' intent by focusing on the objective manifestations of the

13

agreement, rather than on the unexpressed subjective intent of the parties").

Under Washington law, the interpretation of a contract is a question of law when: (1) it does not depend on the use of extrinsic evidence; or (2) only one reasonable inference can be drawn from the extrinsic evidence. *Go2Net,* 115 Wash. App. at 87, 60 P.3d at 1251. "[S]ummary judgment is proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." (*Id.* at 85.)

**C.** **The bankruptcy court erred in granting summary judgment to Paragon.**

    1.   The bankruptcy court's holding is contrary to the express terms of the parties' agreement.

In the ATA, Paragon agreed to assume virtually all liabilities associated with the diaper business. ATA § 2.02(iii) provides that Paragon will assume "all Liabilities and obligations of Weyerhaeuser relating to or arising from the operation of the [diaper] Business." (ATA Annex II ("Assumed Liabilities"), attached to Appellant's Br. at ER1-58; ATA § 2.02(iii), ER1-9.)   The ATA defines "Liabilities" broadly to include:

> any and all debts, liabilities and obligations, whether accrued, contingent or reflected on a balance sheet, including, without limitation, those arising under . . . (ii) any judgment or award of any court or arbitrator or (iii) any contract, commitment or undertaking.

(ATA § 1.01, ER1-9.)

14

In the IPA, Paragon specifically agreed to assume any liability arising from patent infringement claims.   In IPA § 4.01 the parties agreed that Paragon:

> shall be obligated for and hereby agrees to indemnify, defend and hold harmless Weyerhaeuser for, from and against any and all liability, expense and costs asserted against, imposed on, or incurred by Weyerhaeuser, directly or indirectly, for patent . . . infringement or other similar claims involving products, processes, materials and/or equipment relating to the [diaper] Business or Products made, used or sold prior to, on or after the Closing Date.

(IPA § 4.01, ER2-9.)

In the Assumption Agreement, executed at closing, Paragon specifically agreed to assume the P&G and KC claims.   Under the Assumption Agreement, Paragon assumed:

> the Liabilities and obligations relating to all Actions related to or arising out of the operations of the [diaper] Business[] including, without limitation, all actions listed on Schedule 3 hereto; . . .

(Assumption Agreement at 2(g), ER3-2.)   Schedule 3 is titled "Actions."   (*Id.* at Schedule 3.)   It includes the following description of the P&G claims:

> The Company was notified in December, 1991 of the result of Proctor & Gamble's analysis of the Company's Ultra product and concerns about the infringement of U.S. Patents 4,695,278 (Lawson) and 4,795,454 (Dragoo). Modifications of the Company's product are being studied. The Lawson patent was subject to an appeal resulting from a Kimberly-Clark Seattle suit.   The appeal decision was generally in favor of Kimberly-Clark, leaving the Lawson patent with narrow claims.   Settlement discussions are continuing.

15

Schedule 3 also describes potential KC claims:

> In November, 1992 Kimberly-Clark began a dialogue with
> the Company concerning some Kimberly-Clark patents and
> the Company's current inner leg gather diaper and
> training pant product. Kimberly-Clark has recently filed
> suit against Drypers Corp. and Pope & Talbot in the U.S.
> District Court in Seattle alleging infringement of one of
> the same patents.  Kimberly-Clark has offered the Company
> a license, upon the payment of royalties, for the right
> to continue to use the inner-leg feature.   The Company
> has taken the position that the patent coverage claimed
> by Kimberly-Clark is not applicable to the Company's
> products and is of questionable validity.

(*Id.*; ER3-24.)

     None of these provisions is ambiguous.  Under the ATA, the IPA,
and the Assumption Agreement, Paragon expressly agreed to assume the
risk of patent infringement claims related to the ILG, specifically
the P&G and KC claims that resulted in Paragon's bankruptcy.  Indeed,
Paragon's attorneys conceded at oral argument in the bankruptcy court
that Paragon expressly agreed to assume the specific liabilities at
issue in this case.   (Tr. of Hr'g on Mot. for Reconsideration, BR
Docket [150] at 85.)

> 2.   The warranties do not support the bankruptcy court's
>      decision to shift liability for the P&G and KC claims
>      to Weyerhaeuser.

     Despite Paragon's express and specific assumption of liability,
the  bankruptcy  court  held  Weyerhaeuser  responsible  for  damages
resulting from the P&G and KC claims. (SJO at 53.)  This holding was
based  on  the  bankruptcy  court's  determination  that  Weyerhaeuser

16

breached four warranties in the transfer documents, including: (1) the good title warranty in the ATA; (2) the listed patents warranty in the IPA; (3) the "sufficiency of assets" warranty in the ATA; and (4) the "adequacy" warranty in the IPA.   (SJO at 30-44.)   The warranties, reasonably construed, do not support the bankruptcy court's decision.

> ### a.   The good title warranty is not implicated in this case.

In the ATA, Weyerhaeuser warranted that it:

> has, and will transfer to [Paragon] at the Closing, good title to all of the other Assets to be transferred by [Weyerhaeuser] hereunder, free and clear of any and all mortgages, security interests, liens, claims, charges, options and encumbrances of any nature whatsoever, except for minor defects and irregularities in title or encumbrances that do not materially impair the use of any such Assets for the purposes for which they are held.

(ATA § 3.01(c); ER1-17.)   The bankruptcy court held that Weyerhaeuser breached this warranty because the P&G and KC claims constituted "encumbrances" on the transferred assets.   (SJO at 37-38.)

As an initial matter, the bankruptcy court's interpretation of § 3.01(c) as shifting liability for the P&G and KC claims to Weyerhaeuser puts the warranty in direct conflict with Paragon's express assumption of the same claims in several other provisions of the transfer documents.   Unlike those other provisions, § 3.01(c) does not mention patent claims generally or the P&G and KC claims specifically.   To the extent § 3.01(c) conflicts with Paragon's

17

express agreement to assume the risk of P&G and KC's patent claims, the more specific assumption of liability controls.  *See Diamond B Constructors, Inc. v. Granite Falls Sch. Dist.,* 117 Wash. App. 157, 165, 70 P.3d 966, 970 (2003) ("Where the contract provides a general and a specific term, the specific controls over the general."); and *Washington Local Lodge No. 104 v. Int'l Bhd. of Boilermakers, Ironship Builders and Helpers of Am.,* 28 Wash. 2d 536, 541, 183 P.2d 504, 507 (Wash. 1947) (recognizing that "specific provisions ordinarily qualify the meaning of . . . general provisions.")

Moreover, the bankruptcy court's holding ignores the basic purpose of title warranties, which is to ensure that a transferee receives marketable title to property.  *See Liberty Lake Sewer Dist. No. 1 v. Liberty Lake,* 37 Wash. App. 809, 817, 683 P.2d 1117, 1122 (1984) ("Marketable title has been defined as one free of reasonable doubt and such as a reasonably informed and intelligent buyer, exercising ordinary business prudence, would be willing to accept. It need not be perfect in the sense it is free of every conceivable technical criticism, but only from those possibilities of a defect which could give rise to a reasonable question of its validity."). Paragon does not claim that Weyerhaeuser lacked title to any particular asset transferred at the closing, or that its title to any asset was encumbered by an adverse claim such that Paragon's title was not "marketable."  *Compare Scott v. Stanley,* 149 Wash. 29, 270 P.

18

110 (Wash. 1928)(finding that a potential adverse claim to property rendered its title unmarketable).   Paragon relies instead on the argument that its title to *all* of the assets used in the business was encumbered by a risk of patent liability that threatened the business generally.   The Court rejects this expansive, and unprecedented, interpretation of the standard title warranty language of § 3.01(c).[2]

As the bankruptcy court recognized, the language of ATA § 3.01(c) "constitutes a warranty by Weyerhaeuser that the various non-Real property assets would be transferred with good title." (SJO at 38.)   Section 3.01(c) was intended to ensure that Paragon received marketable title to each asset that Weyerhaeuser transferred to Paragon under the ATA.   Paragon cites no evidence that Weyerhaeuser lacked good title to any asset that it transferred to Paragon at the closing.   Thus, ATA § 3.01(c) is not implicated in this litigation.

### b.   **Weyerhaeuser did not breach the listed patents warranty.**

In IPA § 3.11(ii), Weyerhaeuser warranted that:

Schedule[] 3.01(a) [is an] accurate and complete list[] of all Patent Rights . . ., as used in connection with the Business or the Products.

---

[2] The cases cited by the bankruptcy court do not support its broad reading of the title warranty.   *Reeves Bros., Inc. v. U.S. Laminating Corp.*, 282 F.Supp. 118, 134 (E.D.N.Y. 1968) simply defines the term "patent." It is not relevant to this case.   *Hebb v. Severson*, 32 Wash. 2d 159, 201 P.2d 156 (Wash. 1948), which involves a standard claim of lack of good title to real property, is also inapplicable.

AO 72A
(Rev.8/82)

(IPA § 3.11(ii), ER2-9.)  The bankruptcy court held that Weyerhaeuser breached this warranty because "[n]o licenses to use P&G's Lawson and Dragoo patents, or to use KC's Enloe patents, were listed or conveyed."  (SJO at 39.)

The purpose of the IPA § 3.11(ii) warranty was to identify all of the patent rights related to the diaper business that Weyerhaeuser owned and was transferring to Paragon.  This is apparent from the opening statement in IPA § 3.01, which provides:

> Assignment of Rights.  On the Closing Date, Weyerhaeuser shall assign, convey and transfer to Paragon all its right, title and interest in:
>
> > 3.01(a) the Patent Rights identified in Schedule 3.01(a) hereto; . . .

(IPA § 3.01, ER2-5.)  The P&G and KC patents were not included on Schedule 3.01(a) because Weyerhaeuser did not own any "right, title [or] interest in" those patents.  Indeed, it would have been fraudulent for Weyerhaeuser to include the P&G and KC patents on schedule 3.01(a).

Paragon cites no evidence in the record that Weyerhaeuser did not own the patents listed on schedule 3.01(a).  Neither does Paragon cite any evidence that Weyerhaeuser failed to transfer to Paragon all of the patent rights that Weyerhaeuser owned and used in the diaper business.  Accordingly, there is no evidence that Weyerhaeuser breached the listed patents warranty in IPA § 3.11(ii).

20

c.   **The bankruptcy court's interpretation of the adequacy and sufficiency warranties is unreasonable.**

In the ATA, Weyerhaeuser warranted that the transferred assets were "sufficient to conduct the Business as now being conducted." (ATA § 3.01(d), ER1-17.)   In the IPA, Weyerhaeuser similarly warranted that the transferred intellectual property was "adequate for the continuation of the Business as currently conducted." (IPA § 3.11(vii), ER2-9.)   The bankruptcy court held that Weyerhaeuser breached the "sufficiency" and "adequacy" warranties by failing to transfer "all that was legally required for Paragon to continue to manufacture and sell the same diaper products Weyerhaeuser was selling at the time of the IPO," including licenses from P&G and KC to utilize the ILG feature in its Ultra diaper. (SJO at 31-32.)

In reaching this conclusion, the bankruptcy court accepted Paragon's interpretation of the adequacy and sufficiency warranties. According to Paragon, these warranties guaranteed that Paragon "would be able to conduct the same baby diaper business in the future that Weyerhaeuser had been conducting," which predominantly consisted of selling the Ultra ILG diaper.   (Appellee's Br. [37] at 27-28.) Consequently, Paragon argues, Weyerhaeuser breached the warranties when "P&G's judgment crushed Paragon and again when Paragon could not emerge from bankruptcy to continue its business without obtaining a license from KC."   (*Id.* at 26.)

21

Weyerhaeuser offers an alternative interpretation of the adequacy and sufficiency warranties. According to Weyerhaeuser, the warranties simply ensured that no asset used by Weyerhaeuser in the diaper business would be inadvertently omitted from the transfer. (Appellant's Br. [34] at 35.) Thus, Weyerhaeuser argues, the warranties were intended to assure that Paragon, following the transfer, would be in the same position as Weyerhaeuser with respect to the operation of the business--no better and no worse. (*Id.* at 35-36.)

Considering the adequacy and sufficiency warranties in isolation, Paragon and Weyerhaeuser's interpretations are both reasonable. Focusing on the "continuation" language, the warranties can be read as a guarantee that after the closing, Paragon would be able to continue producing the Ultra ILG diaper, Weyerhaeuser's primary product prior to the closing. Focusing instead on the "as now being conducted" and "as currently conducted" language, the warranties can be read to guarantee only that Paragon would receive all of the assets and intellectual property that Weyerhaeuser was using in the business prior to the closing, including any faults or defects.

Reading the warranties in the context of the entire agreement and applying basic rules of contract interpretation, however, Weyerhaeuser's reading of the warranties is the only reasonable

22

interpretation.  *See Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*,
134 Wash. 2d 692, 705, 952 P.2d 590, 597 (Wash. 1998) ("We must
interpret the [contract] as a whole, giving reasonable effect to each
of its parts.") (citing *Pub. Employees Mut. Ins. Co. v. Sellen
Constr. Co.*, 48 Wash. App. 792, 796, 740 P.2d 913 (1987).   The
adequacy and sufficiency warranties are part of a larger agreement
transferring Weyerhaeuser's diaper business to Paragon.   That
agreement unambiguously indicates the parties' intent for Paragon to
accept the risk of patent infringement claims generally, and of the
P&G and KC claims specifically.  (ATA § 2.02, ER1-9; IPA § 4.01, ER2-
9-10; Assumption Agreement, ER3.)   Paragon's interpretation shifts
liability for the same claims to Weyerhaeuser, negating a central
feature of the parties' agreement.[3]

In addition, the adequacy and sufficiency clauses do not mention
P&G or KC, or refer in any way to patent infringement claims.
Paragon's assumption of the risk of patent infringement claims,
particularly the P&G and KC claims, is express and specific in
several other provisions of the transfer documents.   To the extent

---

[3]   The Court rejects Paragon's attempt to "harmonize" its
interpretation of the warranties with the specific assumption of
liability.   According to Paragon, it assumed the liability on the
condition that the warranties "were true," that is, Paragon accepted
the risk of liability on the condition that there would be no
liability.   This interpretation renders the specific assumption
completely meaningless.

23

the adequacy and sufficiency warranties conflict with Paragon's express assumption of the P&G and KC claims, the more specific assumption of liability controls. *See Diamond B Constructors, Inc.,* 70 P.3d at 970 ("where the contract provides a general and a specific term, the specific controls over the general").

In fact, Paragon's interpretation of the adequacy and sufficiency warranties is untenable in light of the parties' specific warranty addressing patent infringement claims, which Weyerhaeuser indisputably did not breach. In IPA § 3.11(iv) Weyerhaeuser warranted that:

> there is no claim, suit, action or proceeding pending or threatened against Weyerhaeuser or its affiliates asserting that the operation of the Business infringes the rights of any third party except in each case as disclosed in the Prospectuses for the Public Offering.

(IPA § 3.11(iv), ER2-9.) This provision is indicative of the parties' intent for Weyerhaeuser to maintain liability for undisclosed patent infringement claims, but not for disclosed claims. Paragon concedes that Weyerhaeuser did not breach IPA § 3.11(iv) because the P&G and KC claims were disclosed in the Prospectus. (Prospectus at 8, 27-28, ER4.)

3.  The bankruptcy court's interpretation of the contract conflicts with all of the extrinsic evidence of the parties' intent.

As discussed, under Washington's context rule, extrinsic evidence is admissible "for the purpose of ascertaining the intention

24

of the parties and properly construing the writing." *Berg,* 801 P.2d at 229-30; *Hearst,* 115 P.3d at 266.   The bankruptcy court's interpretation of the parties' agreement is contrary to all of the extrinsic evidence of the parties' intent.

**a.   The prospectus conspicuously disclosed Paragon's liability for the P&G and KC claims.**

P&G and KC's potential patent claims were conspicuously disclosed to investors in several places in the Prospectus for the IPO.   (Prospectus at 8, 16, 27-28, and 37.)   In a section titled "Intellectual Property Agreements," the Prospectus explicitly stated that Paragon would assume all liability for patent claims:

> Intellectual Property Agreements . . . [Paragon] will assume all liabilities with respect to intellectual property and will indemnify Weyerhaeuser for such liabilities, whether related to activity before or after the closing date of the Intellectual Property Agreements.

(Prospectus at 47, ER4-47.)   The Prospectus also specifically referenced the P&G and KC claims in several places.   In a section titled "Risk Factors--Patent Rights," the Prospectus informed investors that:

> [Paragon] has recently been in discussions with both Proctor & Gamble and Kimberly-Clark concerning [patent] matters, including matters relating to the coverage of certain patents and pending patents of the national branded manufacturers relating to the inner-leg gather (see "Business-Products").   These discussions may result in the payment of royalties by [Paragon] relating to the inner-leg gather feature on [Paragon's] diapers.   While it is difficult to estimate the potential effects of [Paragon], if any, of such matters, [Paragon] believes

25

> that any outcome with respect to these matters will have
> no material adverse effect on its financial position or
> its results of operations.

(Prospectus at 8, ER4-8.)

The disclosures in the Prospectus are consistent with the parties' agreement that Paragon would assume the risk of patent infringement claims, including P&G and KC's claims relating to the ILG.[4]  If Weyerhaeuser had warranted that the Ultra diaper did not infringe the P&G or KC patents, there would have been no need to disclose the risk of the P&G and KC claims in the Prospectus.  Or at the very least, the Prospectus would likely have also disclosed Weyerhaeuser's obligations under the warranty.[5]  Indeed, such a disclosure would have raised the value of the stock to Weyerhaeuser.

**b.  Every person involved in drafting the contracts testified that the parties intended for Paragon to assume the risk of the P&G and KC claims.**

The P&G and KC infringement claims were the subject of extensive discussion among the participants in the transfer and IPO.  All of

---

[4]  The bankruptcy court did not believe the disclosures in the Prospectus accurately reflected the risk of patent liability.  (BR Findings at ¶ 30.)  It is important to remember, however, that this case does not involve any securities fraud allegations.  In this case, the court was only called upon to interpret the parties' contract.

[5] Where Weyerhaeuser had in fact agreed to retain liability, the Prospectus disclosed that fact.  (Prospectus at 36, 46.)  For example, the Prospectus disclosed that Weyerhaeuser agreed to retain liability for environmental liabilities related to the La Puente superfund site.  (*Id.*)

26

these participants testified that the intent of the parties was that Paragon would bear all risk of patent infringement liability with respect to P&G and KC claims. (*See, e.g.,* Abraham Dep. at 20, 30, 32-33, 43-45, 55-56, 77-84, and Dowdy Dep. at 54, attached to Appellant's Br. at ER5.) In particular, Bobby Abraham,[6] Paragon's CEO and the officer who signed the ATA and IPA on behalf of Paragon, testified as follows:

> [A]ll you lawyers are arguing over something that in concept I thought I'd answered several times over . . . Which is I feel like we agreed that we would indemnify Weyerhaeuser against any lawsuits related to this matter, period.

(Abraham Dep. at 76.)

He also testified:

> Q:   Did anyone from Weyerhaeuser ever say or do anything that gave you reason to believe that Weyerhaeuser would be financially responsible for any of the patent infringement claims of Proctor & Gamble or Kimberly-Clark?
>
> A:   I'll repeat that the way I understood the transaction after we were separated from Weyerhaeuser, Paragon was assuming all of the liabilities and assets associated with the business both past and prospective.

(*Id.* at 20.)

In fact, Mr. Abraham tried to negotiate some form of protection

---

[6] Abraham became Paragon's CEO and President after the transfer. (Prospectus at 25, 38-39.)   Abraham had been president of Weyerhaeuser's Personal Care Products division, which contained the diaper business, since 1988.   (*Id.*)

AO 72A
(Rev.8/82)

from the patent infringement risk with Bob Dowdy, Weyerhaeuser's Project Manager for the Transfer and the officer who signed the transfer documents on behalf of Weyerhaeuser.   Mr. Dowdy testified that he rejected this request:

> [Abraham] asked me on numerous occasions . . . for some sort of sharing or protection or some sort of agreement that would help Paragon if these claims turned out to be worse than any of us thought they would be.   And on repeated occasions I told him that I would not do that, that the structure here was a carve-out, that he was going to have to live as a private company, separate company with the decisions that he and his management team had made as a division of Weyerhaeuser.

(Dowdy Dep. at 54, ER5.)   Abraham testified that he fully understood that Weyerhaeuser was offering no protection from the patent liabilities:

> I know I did discuss with Bob [Dowdy] the fact that I was concerned about the patent issues, and that I would like to have them bear part of the liability or give me some protection if they could, and he said no.   And I understood that.

(Abraham Dep. at 30.)

It is unclear whether the bankruptcy court considered the above testimony in ruling on the summary judgment motions.   The court opined that "[m]uch of Weyerhaeuser's testimonial evidence on summary judgment involves statements of belief, recollection, or "understanding" imparted eight years after the IPO closing by persons who . . . had no personal involvement in the negotiations of the warranties at issue in this case."   (SJO at 11.)   The court then

28

stated that "the testimony from various witnesses about what the witnesses subjectively intended, believed or understood the contracts to provide has been ignored or given little weight." (*Id.* at 12.) This was error for at least two reasons.

First, it is improper to "weigh" evidence on summary judgment. At the summary judgment stage, the bankruptcy court was required to "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *In re Optical Techs., Inc.,* 246 F.3d at 1334 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000)). This Court, reviewing the record *de novo*, must do the same. (*Id.*)

Second, Dowdy and Abraham clearly had personal involvement with the contracts: they signed the contracts on behalf of Weyerhaeuser and Paragon. Although Dowdy and Abraham may not have been personally involved in drafting the warranties, it is obvious from their testimony that they were involved in negotiating the contract as a whole. As discussed above, the warranties must be considered in the context of the whole agreement. Furthermore, Abraham and Dowdy's testimony reflects the parties' mutual intent, as opposed to "merely one party's subjective intent." *DP Aviation v. Smith Indus. Aerospace & Def. Sys., Ltd.,* 268 F.3d 829, 838-39 (9th Cir. 2001)(finding negotiators' testimony concerning their mutual intent proper extrinsic evidence under Washington law.)

The testimony of the signatories to the contract confirms that the mutual intent of the parties was for Paragon to bear the risk of the patent infringement claims asserted by P&G and KC.   Paragon offers no testimony to the contrary. (*See generally*, Appellee's Br. [37].)

        c.    **The parties' subsequent conduct lends credence to Weyerhaeuser's interpretation of the contracts.**

The parties' conduct during the patent litigation is consistent with their belief that Paragon was contractually responsible for the P&G and KC claims. *See Berg,* 115 Wash. 2d at 677-78, 801 P.2d at 234 ("It is well-established that subsequent acts and conduct of the parties to the contract are admissible to assist in ascertaining their intent."). P&G sued Paragon for patent infringement in Delaware district court in January, 1994. KC sued Paragon for patent infringement in Texas district court in October, 1995. Consistent with its full acceptance of patent liabilities in the transfer, Paragon defended the P&G and KC lawsuits on its own, never tendered the defense of either lawsuit to Weyerhaeuser, and never sought indemnification from Weyerhaeuser. (Abraham Dep. at 43-45.)

Paragon's failure to tender the patent claims to Weyerhaeuser is particularly revealing in light of the indemnification and dispute resolution provisions of the parties' contract. In ATA § 11.02 (b), Weyerhaeuser agreed "to indemnify, defend and hold harmless [Paragon]

AO 72A
(Rev.8/82)

. . . from and against any and all Losses arising from or relating to" Weyerhaeuser's breach of any warranty in the contract.   (ATA §11.02(b), ER1-39.)   ATA § 11.03(a) sets forth a specific procedure for indemnification of losses arising from its breach of warranties. (ATA §11.03, ER1-40-42.)   Paragon never invoked these procedures.

The parties' contract also contains detailed dispute resolution procedures.   Article XII of the ATA requires that any dispute as to the interpretation of the Agreement be resolved by mediation and binding arbitration.   (ATA §§ 12.01-12.08.)   If Paragon even had a question about whether its potential patent liability constituted a breach of warranty, it could have invoked the dispute resolution procedures.   It did not.

### d.   Paragon's interpretation of the contract is not reasonable.

Paragon's interpretation of the asset sufficiency warranty also inserts an unreasonable level of uncertainty into the parties' agreement.[7]   See Berg, 115 Wash. 2d at 668, 801 P.2d at 229 (noting that the "reasonableness of the parties' respective interpretations may also be a factor in interpreting a written contract").   Paragon interprets the warranty as a guaranty that Paragon would be able to produce the Ultra ILG, at a profit, for an indefinite period of time

---

[7]   The asset sufficiency warranty was not qualified by Weyerhaeuser's "knowledge."   (SJO at 31.)

31

in the future.  However, a number of factors could affect Paragon's ability to profitably produce and market the Ultra diaper.  Rapid developments in the diaper industry, for example, could make the Ultra ILG obsolete, driving Paragon into bankruptcy.  Under Paragon's interpretation of the warranty, this development would constitute a breach because, as it turned out, Weyerhaeuser did not transfer sufficient assets to continue the business "as conducted" at closing.

The uncertainty inherent in Paragon's interpretation is apparent in the bankruptcy court's summary judgment order.   The bankruptcy court premised Weyerhaeuser's breach of warranty on Paragon's patent liability.   The court found that as a result of the Delaware trial court's patent infringement order in 1997, Weyerhaeuser, in hindsight, had not transferred sufficient assets to Paragon in 1993.[8] (SJO at 39-44.)   It is unlikely that the parties intended their warranty liability to depend on the uncertain outcome of potential future patent litigation.[9]

---

[8]   The bankruptcy court subsequently found, however, that Weyerhaeuser also breached the warranties with respect to the KC claims, even though it was eventually determined in litigation that the Ultra ILG did not even breach KC's patent.

[9] Paragon's interpretation also relies on an improbable sequence of events.   According to Paragon, the adequacy and sufficiency warranties were added by Merrill Lynch during due diligence, without the knowledge of Paragon, a party and signatory to the agreement, and contrary to the express intent of Weyerhaeuser. (Appellee's Br. [34] at 12-16.)   It is unlikely that a warranty provision shifting

32

Moreover, Paragon's arguments concerning both warranties are internally inconsistent.   On one hand, Paragon suggests that Weyerhaeuser was a "bad actor" in attempting to transfer its patent infringement liability to Paragon.   (*See generally,* Appellee's Br. [37].)   On the other hand, Paragon argues that Weyerhaeuser, as a party to the ATA and IPA, actually intended to maintain liability for the P&G and KC claims by virtue of the adequacy and sufficiency warranties.   (*Id.*)

Again, the bankruptcy court's summary judgment order reflects this inconsistency.   In the order, and at trial, it is apparent that the bankruptcy court accepted Paragon's characterization of Weyerhaeuser as a "bad actor."   (SJO at 42.)   The bankruptcy court apparently believed that Weyerhaeuser intended to use the IPO to avoid its "mounting" infringement liability.   (*Id.* at 16.)   The court stated:

> Weyerhaeuser's game plan, clearly, was to stall, delay
> and postpone the inevitable financial disaster and assume
> a naive posture when possible.   Weyerhaeuser was neither
> naive nor innocent.   Weyerhaeuser walked Paragon off the
> plank.

(*Id.* at 42.)   Yet, the bankruptcy court managed to also find that the parties intended for Weyerhaeuser to maintain liability for the

---

liability for a particular risk expressly assumed by Paragon was "slipped into" the contract in this manner without the acquiescence or even awareness of the parties who signed the agreement.

AO 72A
(Rev.8/82)

P&G and KC claims (the same claims it was so eagerly trying to avoid by transferring the business to Paragon) by virtue of the adequacy and sufficiency warranties.  (SJO at 39-44.)  The bankruptcy court's holding fails to give effect even to its own characterization of the parties' intent.

     **D.**    **Weyerhaeuser is entitled to summary judgment on liability.**

The ATA and IPA evidence a clear intent for Paragon to assume the risk of patent infringement claims arising from the operation of the diaper business.  (ATA § 2.02, ER1-9; IPA § 4.01, ER2-9-10.)  The Assumption Agreement clarifies the parties' intent for Paragon to assume all risk of liability related to the P&G and KC claims. (Assumption Agreement, ER3.)  The warranties in the contract cannot reasonably be interpreted to shift liability for these claims to Weyerhaeuser.  Under the express terms of the parties' contract, Paragon is contractually responsible for the P&G and KC claims.  All of the admissible extrinsic evidence supports this result. Accordingly, the Court **REVERSES** the bankruptcy court's order granting summary judgment to Paragon, and denying summary judgment to Weyerhaeuser, on liability, and directs the clerk to enter judgment in favor of Weyerhaeuser.

     **E.**    **Weyerhaeuser is entitled to indemnity for any liability arising from the P&G and KC claims under § 11.02 of the ATA and § 4.01 of the IPA.**

Even if the warranties could be interpreted to shift liability

34

for the P&G and KC claims to Weyerhaeuser, under the express terms of the parties' agreement, Weyerhaeuser would be entitled to indemnification from Paragon for the same liability.   IPA § 4.01 provides:

> Patent, Trade Secret or Trademark Claims.  Paragon shall
> be obligated for and hereby agrees to indemnify, defend
> and hold harmless Weyerhaeuser for, from and against any
> and all liability, expense and costs asserted against,
> imposed on, or incurred by Weyerhaeuser, directly or
> indirectly, for patent, trade secret, copyright or
> trademark infringement or other similar claims involving
> products, processes, materials and/or equipment relating
> to the Business or Products made, used or sold prior to,
> on or after the Closing Date.

(IPA § 4.01).[10]   The P&G and KC claims clearly come within this provision, requiring Paragon to indemnify Weyerhaeuser for any liability arising from these claims.

In rejecting this argument, the bankruptcy court interpreted the IPA's indemnity provision as limited to third-party claims. Specifically, the court found it "clear that the 'claims' for which Paragon agreed to indemnify Weyerhaeuser in Section 4.01 are claims

---

[10] In ATA § 11.02(a), Paragon also agreed to:

indemnify, defend and hold harmless [Weyerhaeuser] from
and against any and all Losses arising from or relating
to (i) any of the Assumed Liabilities assumed by Paragon
. . .

(ATA § 11.02(a), ER1-43.)  As discussed, Paragon concedes that the P&G and KC claims are "Assumed Liabilities."  However, Weyerhaeuser did not raise this argument on summary judgment.

35

by third parties against Weyerhaeuser for patent infringement
relating to the Business." (SJO at 48.)[11] This holding is contrary
to the express language of IPA § 4.01, which requires indemnity for
"*any and all* liability, expense [or] cost incurred by Weyerhaeuser,
*directly or indirectly.*" (IPA § 4.01.) It also leads to illogical
results. Under this interpretation of IPA § 4.01, if P&G and KC had
sued Weyerhaeuser directly for patent infringement, Paragon would
ultimately be responsible for the claims, but because P&G and KC sued
Paragon, Weyerhaeuser is ultimately responsible. That P&G and KC
decided to sue Paragon directly should not foreclose Weyerhaeuser
from its contractual right to indemnity for claims that plainly come
within the indemnity clause of IPA § 4.01.

Giving effect to the unambiguous language of IPA § 4.01, even if
plaintiff were entitled to recover damages from Weyerhaeuser under
any theory, it would also be entitled to indemnification for that
same amount from Paragon. For this additional reason, the Court
**REVERSES** the bankruptcy court's judgment in favor of Paragon, and
directs the clerk to enter judgment in favor of Weyerhaeuser.

---

[11] The bankruptcy court dismissed Weyerhaeuser's indemnity
argument as "circular." The Court agrees with Weyerhaeuser that the
circularity "only exists because the bankruptcy court misinterpreted
the general warranties, i.e., interpreted them as promises by
Weyerhaeuser to indemnify Paragon for losses resulting from the very
same claims that Paragon had specifically agreed to assume."
(Appellant's Br. at 85.) If the warranties are interpreted
correctly, the circularity disappears.

AO 72A
(Rev.8/82)

### III.  Paragon's Cross-Appeal

Paragon has filed a cross-appeal relating to the bankruptcy court's denial of prejudgment interest on certain elements of damage. (Appellant's Br. at 94.)  Paragon argues that the bankruptcy court applied the wrong legal standard, and that, under the correct standard, Paragon is entitled to interest.  (*Id.* at 95.)  The Court has reversed the bankruptcy court's summary judgment rulings.  Having concluded that Weyerhaeuser is entitled to summary judgment on liability, and that Paragon is entitled to no damages, Paragon's argument concerning prejudgment interest is moot.  Accordingly, the Court does not address Paragon's cross-appeal on the issue of prejudgment interest.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** Paragon's Motion for Leave to File Post-Hearing Brief [50], **GRANTS** Paragon's Motion to Supplement the Record [52], and **REVERSES** the bankruptcy court's order granting summary judgment to Paragon and entering judgment against Weyerhaeuser.


SO ORDERED, this _26_ day of September, 2007.


JULIE E.  CARNES
UNITED STATES DISTRICT JUDGE

37

AO 72A
(Rev.8/82)